UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

Kathleen Dukes,

        Plaintiff,

                                        Case No. 2:03-CV-00784
v.                                   JUDGE SMITH
                                      Magistrate Judge Abel

ADS Alliance Data Systems, Inc.,

        Defendant.

## OPINION AND ORDER

Plaintiff Kathleen Dukes ("Plaintiff" or "Ms. Dukes") brings this action against Defendant ADS Alliance Data Systems, Inc. ("Defendant" or "ADS"). Plaintiff asserts claims of age and gender discrimination under the Age Discrimination in Employment Act, 29 U.S.C. § 621, Ohio Revised Code Chapter 4112 and Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000(e). Additionally, Plaintiff alleges violations of federal and state wiretap laws under The Federal Electronic Communications Privacy Act, otherwise commonly known as Title III of the Omnibus Crime Control Act under 18 U.S.C. §§ 2510-2522 ("Title III") and O.R.C. § 2933.52(A). Finally, she asserts Ohio common law causes of actions for breach of express contract, breach of implied contract, promissory estoppel and violation of public policy. Defendant ADS has moved for summary judgment with respect to all claims (Doc. 51). For the reasons that follow, the Court **GRANTS** in part and **DENIES** in part the Defendant ADS's Motion for Summary Judgment.

## I.  FACTUAL BACKGROUND

Plaintiff, Kathleen S. Dukes, began her employment as a Recovery Specialist at Limited Credit Services in 1988 at its Broad Street location.  In 1997, there was a merger between Limited Credit Services and ADS.  Following this merger, Plaintiff transferred to ADS's Westerville, Ohio location.

Ms. Dukes, throughout her employment with ADS, worked as a Recovery Specialist in the Audit and Investigations Department.  As a Recovery Specialist, Ms. Dukes's main job duty was to call debtors in order to seek payment in delinquent accounts.  More specifically, on any given work day, Ms. Dukes spent at least 60% of her time calling debtors and the remaining time doing paperwork or "skip tracing" (which included pulling a copy of the debtor's credit report to find out information such as address, contact information, etc.).

Following the 1997 merger, Ms. Dukes' supervisors included Chris Judge ("Judge"), Director, and J.K. (James) Smith ("Smith"), Audit and Investigations Manager.  In February, 1999, Susie Mackanos ("Mackanos"), Audit and Investigations Department Manager, was Ms. Dukes' immediate supervisor and continued in this role until October, 2001, when Jim Fortier ("Fortier") became the Audit and Investigation Department Manager and Ms. Dukes' immediate supervisor.  In August, 2000, Jody Spriggs became the Audit and Investigations nighttime supervisor.  Erick Carter was the ADS Manager of Human Resources at ADS's Westerville location.

### A.    Alleged Age and Gender Discrimination

In 1998, shortly after ADS took over Limited Credit Services, Ms. Dukes alleges that during a

one-on-one meeting between herself and Mr. Judge, that Mr. Judge said "the Limited was no longer

the mom and pop organization that you used to work for, so you old-timers have to get used to that

idea" and "you old-timers are from the old school and things are going to change."    Ms. Dukes admits,

however, that Judge made no reference to her age in particular; and, at the time Judge allegedly made

the comment, Ms. Dukes had been with Limited Credit Services for ten years.  Ms. Dukes does not

attribute any other age or gender-related remarks to Judge or any of her other managers throughout the

entire course of her employment.

From 1997 through 2000, Ms. Dukes claims that she consistently received favorable reviews

with no negative comments and received merit raises.

On May 9, 2001, Plaintiff placed a call to a debtor Lupita Rangel at her place of employment in

Texas, seeking to collect on an overdue credit card account.  Ms. Rangel worked for the Texas

Sheriff's Department as a dispatcher.  The Sheriff's office recorded all incoming calls, including the

May 9, 2001 call from Ms. Dukes to Ms. Rangel.

On January 8, 2002, ADS received a demand letter for $10,000 from Ms. Rangel's attorney

based upon Ms. Dukes' statements during the May 9, 2001 call with Ms. Rangel.  The demand letter

asserted, in part, that Plaint        iff had engaged in "harassing" behavior, was "abusive" and

"unreasonable" toward Ms. Rangel, and that the call to Ms. Rangel was designed to "embarrass and

harass Ms. Rangel at work" in a manner that violated the law.  ADS began to investigate these

allegations.

On January 18, 2002, Ms. Dukes was called into an office with Mr. Smith and Mr. Carter.

Mr. Smith proceeded to read a certified copy of a transcript of a tape recorded telephone conversation

that Ms. Dukes admits she had with a customer on May 9, 2001.  After reading the transcript, Mr.

Smith told Ms. Dukes that she was being placed on Unacceptable Performance Notice ("UPN") for a

violation of the Fair Debt Collection Practices Act ("FDCPA") which occurred during the at-issue May

9, 2001, telephone conversation and also for unacceptable work habits.  The UPN stated that Ms.

Dukes' performance will be reviewed again on an "ongoing" basis.  Ms. Dukes' requests to listen to the

tape recording were denied.  This UPN resulted in a suspension of Ms. Dukes' incentive pay for 90

days, a postponement of her merit pay increase and a reduction of her merit pay increase by 1%.

On or about April 4, 2002, ADS received a tape recording of the May 9, 2001, telephone

conversation from Ms. Rangel's attorney.  On or about April 10, 2002, ADS agreed to pay $12,500

to Ms. Rangel in settlement of her claims.  On or about April 16, 2002, ADS issued a check in the

amount of $12,500 payable to Mr. Crosely, Ms. Rangel's counsel.

Ten days later, on April 26, 2002, Ms. Dukes was terminated.  Mr. Smith called Ms. Dukes

into an office and Mr. Smith told Ms. Dukes she was terminated for the FDCPA violation occurring

during the May 9, 2001 telephone call.  Again, Ms. Dukes' requests to listen to the tape recording of

the May 9, 2001 call were denied.  On May 6, 2002, Ms. Dukes' Recovery Specialist position was

filled by Michael Christian, age 27.

Ms. Dukes claims that Ed Baisden, Rashad Barksdale and Mark Reichley, all Recovery

Specialists with the same supervisors as Ms. Dukes, violated the FDCPA and/or the Code of Ethics

and were treated more favorably that she was.  All of these individuals were male and under the age of

40.

On March 25, 2002, Mr. Baisden was placed on Unacceptable Performance Notice for

4

violating the FDCPA and Code of Ethics by "telling customers that lawsuits were filed against them." In 2001, Mr. Baisden had been counseled for using the phrase "pending lawsuits." Mr. Baisden's UPN stated that performance would be reviewed again 90 days from the date of the UPN. Mr. Baisden's Annual Performance Appraisal did not reference his prior UPNs and there was no percentage deduction in his Annual Merit Increase due to the 2002 UPN. On July 28, 2004, Mr. Baisden was fired for multiple violations of the FDCPA.

On March 12, 2002, Mr. Barksdale was placed on Unacceptable Performance Notice for "Code of Ethics violation - 2 lawsuits in two months." Throughout Mr. Barksdale's employment with ADS as a Recovery Specialist, he had been counseled and/or disciplined at least seven times for infractions of the FDCPA and Code of Ethics. According to Ms. Watts, ADS Vice President and Counsel, Mr. Barksdale "received a UPN for minor violations of Alliance's Code of Ethics, after Alliance received two complaints regarding his collection efforts. Specifically, Alliance received two demand letters threatening lawsuits and claiming Barksdale had harassed customers" and "[h]ad Barksdale committed further infractions of the FDCPA, he would have been subject to discharge." Mr. Barksdale's UPN stated that performance would be reviewed again 90 days from the date of the UPN. Prior to receipt of this UPN, Mr. Barksdale had been placed on Unacceptable Performance Notice on June 17, 1998, due to "escalated supervisor calls." Ms. Dukes was unable to ascertain whether or not this UPN affected Mr. Barksdale's compensation due to the lack of documentation she received from ADS. Mr. Barksdale was not fired for his violations of the FDCPA. On July 29, 2002, Mr. Barksdale was promoted to Westerville Collection Specialist.

On October 11, 2001, Mr. Reichley was placed on Unacceptable Performance Notice for making "13 calls in a row (8 to the customer's ex-wife). This is a violation of the FDCPA and COE." Mr. Reichley's violations resulted in ADS' receipt of a demand letter from the ex-wife's attorney and payment by ADS for settlement and release of the ex-wife's claims. According to Ms. Watt's, "Reichley received a UPN after a customer complained of repeated phone calls from him. Reichley used poor judgment in conducting his duties; however, the incident was not such a severe violation of the FDCPA that the actions warranted termination of his employment." Mr. Reichley's UPN stated that performance would be reviewed again 90 days from the date of the UPN. Mr. Reichley's May 15, 2002, Annual Performance Appraisal did reference the October 11, 2001 UPN, but this UPN did not result in a percentage deduction to his Annual Merit Increase. Mr. Reichley was not fired for his violations of the FDCPA.

**C.      Alleged Harassment**

Ms. Dukes claims that ADS associate, John Taylor continually made "loud, vulgar, lewd and inappropriate jokes and comments" and also that he would "stare at women's breasts while they were speaking to him." (Pl's Memo. in Opp. at 72). Ms. Dukes testified that she did not make any written complaints regarding Mr. Taylor because she was afraid to, but that she did verbally complain to Ms. Mackanos. Ms. Mackanos told Ms. Dukes "they were looking into it." (Dukes Depo. at 91-94). Ms. Dukes does not allege that she suffered any repercussions from reporting the conduct, but nonetheless alleges that her fear of repercussions prevented her from using ADS' "open door" policy to report the continued harassment by Mr. Taylor to managers. (Pl's Memo. in Opp. at 72).

ADS' harassment policy was set forth in the March, 2001, Associate Handbook as follows:

6

> Alliance is committed to taking all steps necessary to maintain a productive work environment free of harassment and intimidation of any type, including on the basis of sex, race, color, national origin, age, sexual orientation, religion, disability, veteran status, marital status or any other status which may be protected by the law. Harassment of any kind os not condoned by Alliance and will not be tolerated in the workplace.

The policy required all ADS associates to "immediately report to any management officials any incident of harassing conduct in violation of [the] policy."

## C.  Phone Monitoring

ADS' telephone monitoring policy was set forth in the March, 2001, Associate Handbook, Section 515.  The monitoring policy provides, "[w]e periodically monitor and tape phone calls with our customers to improve our associates' telephone skills and job performance."  ADS promises to "[c]learly indicate which telephones are monitored and provide associates with access to alternative telephones for private conversations."  The Associate Handbook, further stated that ADS would provide its associates with the "opportunity to review information obtained by electronic monitoring when such information is used as the basis for any employment decision."  Additionally, Ms. Dukes was required to and did annually sign a the ADS's Audit and Investigations Department's "Taping and Monitoring" consent forms which stated "[t]o enhance and provide adequate feedback Alliance Data Systems (ADS) will periodically tape record and monitor conversations between associates and customers.  Recovery Specialists were permitted to utilize their phones for personal use, but were asked to keep such calls to a minimum.  Pay phones were available to ADS employees.  Cell phone usage was not prohibited by ADS, but Ms. Dukes did not own a cell phone.

On two separate occasions, ADS management listened in on her personal calls.

On March 1, 2001, Ms. Mackanos, Audit and Investigation Department Manager, listened in on a call

Ms. Dukes made to her husband.  Ms. Dukes learned of this occurrence on or about July 10, 2002, when she received copies of documents that ADS provided to the State of Ohio Department of Jobs and Family Services, one of which was a memorandum, dated March 2, 2001, signed by Ms. Mackanos stating in part: "I heard the incoming call in the background since I was talking to Jody at the time.  I was not going to listen since I knew the call was from her husband, however, when she started off with the chair story, I began to listen."  This particular call lasted 30 minutes.  Ms. Dukes alleges that Ms. Mackanos utilized the contents of this conversation to discipline Ms. Dukes for her "work habits" on the January 18, 2002 Unacceptable Performance Notice.  Because Ms. Dukes did not learn of this situation prior to her termination, she was unable to report it to higher management.  On September 13, 2001, Jody Spriggs, ADS manager, listened in on a call Ms. Dukes made to her husband.  On this particular call, Ms. Dukes relayed a story regarding an incident at work that made her feel physically threatened by another co-worker.  While Ms. Dukes' husband was advising her as to how he though she should respond to the situation, Ms. Spriggs broke into the telephone call and scolded Ms. Dukes for "not handling the situation in a mature manner."  Ms. Dukes did not report this incident to higher management because she did not want to risk being fired.

## II.  SUMMARY JUDGMENT STANDARD

The standard governing summary judgment is set forth in Fed. R. Civ. P. 56(c), which provides:

> The judgment sought shall be rendered forthwith if the pleadings,
> Depositions, answers to interrogatories, and admissions on file, together
> with the affidavits, if any, show that there is no genuine issue as to any
> material fact and that the moving party is entitled to judgment as a
> matter of law.

Summary judgment will not lie if the dispute about a material fact is genuine; "that is, if the

evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Summary judgment is appropriate, however, if the opposing party fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *see also Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 588 (1986).

When reviewing a summary judgment motion, the Court must draw all reasonable inferences in favor of the nonmoving party, and must refrain from making credibility determinations or weighing the evidence. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150-51 (2000).[1]  The Court disregards all evidence favorable to the moving party that the jury would not be required to believe. *Id.* Stated otherwise, the Court must credit evidence favoring the nonmoving party as well as evidence favorable to the moving party that is uncontroverted or unimpeached, if it comes from disinterested witnesses. *Id.*

The Sixth Circuit Court of Appeals has recognized that *Liberty Lobby, Celotex,* and *Matsushita* have effected "a decided change in summary judgment practice," ushering in a "new era" in

---

[1]  *Reeves* involved a motion for judgment as a matter of law made during the course of a trial under Fed. R. Civ. P. 50 rather than a pretrial summary judgment under Fed. R. Civ. P. 56. Nonetheless, standards applied to both kinds of motions are substantially the same.  One notable difference, however, is that in ruling on a motion for judgment as a matter of law, the Court, having already heard the evidence admitted in the trial, views the entire record, *Reeves*, 530 U.S. at 150.  In contrast, in ruling on a summary judgment motion, the Court will not have heard all of the evidence, and accordingly the non-moving party has the duty to point out those portions of the paper record upon which it relies in asserting a genuine issue of material fact, and the court need not comb the paper record for the benefit of the nonmoving party.  *In re Morris*, 260 F.3d 654, 665 (6th Cir. 2001). As such, *Reeves* did not announce a new standard of review for summary judgment motions.

summary judgments.  *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1476 (6th Cir. 1989).  The

court in *Street* identified a number of important principles applicable in new era summary judgment

practice.  For example, complex cases and cases involving state of mind issues are not necessarily

inappropriate for summary judgment.  *Id.* at 1479.

Additionally, in responding to a summary judgment motion, the nonmoving party "cannot rely

on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact, but must 'present

affirmative evidence in order to defeat a properly supported motion for summary judgment.'"  *Id.,*

*quoting Liberty Lobby*, 477 U.S. at 257.  The nonmoving party must adduce more than a scintilla of

evidence to overcome the summary judgment motion.  *Id.*  It is not sufficient for the nonmoving party to

merely "'show that there is some metaphysical doubt as to the material facts.'"  *Id., quoting*

*Matsushita*, 475 U.S. at 586.

Moreover, "[t]he trial court no longer has a duty to search the entire record to establish that it is

bereft of a genuine issue of material fact."  *Id.* at 1479-80.  That is, the nonmoving party has an

affirmative duty to direct the court's attention to those specific portions of the record upon which it

seeks to rely to create a genuine issue of material fact.  *In re Morris*, 260 F.3d 654, 665 (6th Cir.

2001).

### III.  DISCUSSION

**A.**      **Age and Gender Discrimination**

In considering age and gender discrimination claims under O.R.C. Chapter 4112, the Ohio

Supreme Court has adopted the tests established by the federal courts for assessing claims under

parallel anti-discrimination statutes.  *Plumbers and Steamfitters Joint Apprenticeship Committee v.*

10

*Ohio Civil Rights Commission*, 66 Ohio St.2d 192, 196 (1981). Thus, the Court will address Ms. Dukes' age discrimination claim under 4112 and her ADEA claim together. Likewise, Ms. Dukes' gender discrimination claims under O.R.C. Chapter 4112 and her Title VII claim will be addressed together.

Title VII of the Civil Rights Act of 1964 prohibits an employer from discriminating "against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(A)(1). In a gender discrimination action, the plaintiff may prove discrimination by direct evidence or by establishing a *prima facia* case.

Similarly, the ADEA provides that it shall be unlawful for an employer "to fail or refuse to hire or to discharge any individual or otherwise discriminate with respect compensation, terms, conditions, or privileges of employment because of such individual's age." 29 U.S.C. § 623(a). The ADEA applies to individuals forty years of age or older. 29 U.S.C. § 631(a). A plaintiff who brings a claim under the ADEA must prove that age was a determining influence in the adverse action that the employer took against him. *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 141 (2000); *Wilson v. Firestone Tire & Rubber Co.*, 932 F.2d 510, 514 (6th Cir. 1991).

## 1. Direct evidence of age or gender discrimination

Ms. Dukes admits that she cannot offer direct evidence of gender discrimination. Ms. Dukes', however, contends that comments she alleges Mr. Judge made in1998 qualifies as direct evidence. This Court disagrees and finds that Ms. Dukes has not presented direct evidence of discrimination.

"In discrimination cases, direct evidence is that evidence which, if believed, requires the conclusion that unlawful discrimination was at least a motivating factor in the employer's actions." *Jacklyn v. Schering-Plough Healthcare Prods. Sales Corp.*, 176 F.3d 921, 926 (6th Cir. 1999). "For example, a facially discriminatory employment policy or a corporate decision maker's express statement of a desire to remove employees in the protected group is direct evidence of discriminatory intent." *Nguyen v. City of Cleveland*, 229 F.3d 559, 563 (6th Cir. 2000). However, "isolated and ambiguous statements ... are too abstract, in addition to being irrelevant and prejudicial, to support a finding of discrimination." *LaPointe v. United Autoworkers Local 600*, 8 F.3d 376, 380 (6th Cir. 1993) (*quoting Gagne v. Northwestern Nat'l Ins. Co.*, 881 F.2d 309, 314 (6th Cir. 1989)). In other words, the Court must examine not only the substance of any allegedly discriminatory evidence, but also determine whether there exists any causal connection between the purported animus and the adverse employment action.

In the present case, Mr. Judge's alleged comment to Ms. Dukes – that things were going to change for old-timers from the old school – occurred in 1998, shortly after the merger of ADS and Limited Credit Service and *several years* before Ms. Dukes was placed on Unacceptable Performance Notice. This comment was both isolated and ambiguous, and further, there is no causal connection between the alleged comment and the adverse employment actions suffered by Ms. Dukes.

Accordingly, this Court finds that Ms. Dukes cannot prove age or gender discrimination by direct evidence, and therefore, the Court will determine whether Ms. Dukes has presented a *prima facie* case of age or gender discrimination.

**2.** ***Prima facie* case of age and gender discrimination**

Plaintiff Ms. Dukes claims she can establish a *prima facie* case of age and gender discrimination under *McDonnell Douglas*.  Defendant ADS argues that Ms. Dukes cannot establish a *prima facie* case of age or gender discrimination because she cannot establish that she was treated differently from similarly-situated persons outside of her protected class.

The elements of a *prima facia* case of employment discrimination based on age or gender are: (1) that the plaintiff is a member of a protected class (over 40 years of age for an age discrimination claim); (2) that the plaintiff was qualified for the position; (3) that the defendant subjected the plaintiff to an adverse employment action; and (4) that the defendant did not subject similarly situated persons outside the protected class to such adverse action. *See St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 506 (1993);  *Kesselring v. United Technologies Corp.*, 753 F. Supp. 1359, 1364 (S.D. Ohio 1991); *Simpson v. Midland-Ross Corp.*, 823 F.2d 937, 940 (6th Cir. 1987); *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802 (1973).  If the plaintiff establishes a *prima facie* case, then the burden shifts to the defendant to come forward with a legitimate, non-discriminatory reason for the adverse action against the plaintiff.  *See id.*; *Texas Dept. of Comm. Affairs v. Burdine*, 450 U.S. 248, 252-53 (1981).  If the defendant comes forward with a legitimate, non-discriminatory reason for its actions, then the burden shifts to the plaintiff to prove that the defendant's proffered reason is a mere pretext for discrimination. *See id.*; *Burdine*, 450 U.S. at 253.  "The nature of the burden that shifts to the defendant should be understood in light of the plaintiff's ultimate and intermediate burdens.  The ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff."  *Burdine*, 450 U.S. at 253.

It is uncontroverted that Ms. Dukes belongs to a protected class; she is a female and

over 40 years in age.  ADS does not dispute that Ms. Dukes was qualified for the position of Recovery

Specialist or that the January 18, 2002 UPN and subsequent termination were adverse actions.  The

parties dispute, however, whether Ms. Dukes has proved the final element of a *prima facie* case; that

is, whether ADS subjected similarly situated persons outside the protected class to adverse action.

Additionally, Defendant ADS contends that even if Ms. Dukes is able to establish a *prima facie* case

of age or gender discrimination, her discrimination claims must fail because she is unable to meet her

burden to prove that ADS's proffered reason for its actions is a mere pretext for discrimination.

### a.    Treatment different than similarly situated employees

To establish the fourth element of a *prima facie* case, Ms. Dukes must establish that all relevant

aspects of her employment situation were "nearly identical" to those of the employee who was allegedly

treated more favorably.  *Pierce v. Commonwealth Life Ins. Co.*, 40 F.3d 796, 802 (6th Cir. 1994).

To be deemed "similarly situated" the comparable employee "must have dealt with the same supervisor,

have been subject to the same standards and have engaged in the same conduct without such

differentiating or mitigating circumstances that would distinguish their conduct or the employer's

treatment of them for it." *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 583 (6th Cir. 1992).  In

determining whether an allegedly comparable employee is similarly situated, the ultimate question is

whether "all of the *relevant* aspects of [her] employment situation were 'nearly identical' to those of the

[comparator's] employment situation." *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344

(6th Cir. 1998).

Ms. Dukes has alleged that younger male recovery specialists, Messrs. Baisden, Richley and

Barksdale were similarly situated, violated the FDCPA and/or Code of Ethics and received more

14

favorable treatment on account of their age and gender.[2]  Defendant ADS argues that these men were not similarly situated because (1) the men's violations are not substantially similar in severity or type to that of Plaintiff; (2) none of these men had verified recordings of their alleged violations; and (3) ADS did not pay out over $10,000 in settlement monies as a result of alleged violations by these individuals.

In the instant case, the Court has reviewed the evidence Plaintiff has submitted, and based upon *Mitchell* and *Ercegovich*, concludes that the factors cited by ADS make clear that Messrs. Baisden, Richley and Barksdale were not similarly situated to Ms. Dukes in "all of the relevant aspects."  Thus, Plaintiff has failed to establish a *prima facie* case of age and gender discrimination and Defendant ADS is consequently entitled to summary judgment in its favor on these claims.

### b.     Pretext

Defendant ADS argues that even if Ms. Dukes had made a *prima facie* case of age or gender discrimination, ADS had a legitimate, non-discriminatory reason for placing her on Unacceptable Performance Notice and terminating her and that Ms. Dukes identifies no evidence establishing that ADS's explanation for its actions was pretextual.  This Court agrees.

"An employee can show pretext by offering evidence that the

---

[2]Notably, Ms. Dukes, in her deposition testimony, seems to complain that everyone, including other women, received more favorable treatment than she did. (Dukes Depo. at 97-101, 113-115, 131-133, 146-147, 163-164, 236).

employer's proffered reason had no basis in fact, did not actually motivate its decision, or was never used in the past to discharge an employee." *Smith v. Chrysler Corp.*, 155 F.3d 799, 805-06 (6th Cir. 1998). "In challenging an employer's action, an employee `must demonstrate that the employer's reasons (each of them, if the reasons independently caused [the] employer to take the action it did) are not true.'" *Id.* (*quoting Kariotis v. Navistar Int'l Trans. Corp.*, 131 F.3d 672, 676 (7th Cir. 1997)).

In examining whether the stated reason is pretext, the Court must determine whether the employer reasonably relied on the particularized facts before it at the time it made the employment decision. *Smith*, 155 F.3d at 807. The employer is not required to show that it left no stone unturned; rather, the issue is whether the employer made a reasonably informed and considered decision before taking the adverse employment action. *Id.* The Court should not blindly accept the proffered reason as honest. *Id.* If the employee adduces evidence establishing that the employer failed to make a reasonably informed and considered decision, then its decisional process is "unworthy of credence," and any reliance by the employer on such a process cannot be deemed "honestly held." *Id.* at 807-08.

In the instant case, Defendant ADS has articulated legitimate,

16

non-discriminatory reasons for terminating Ms. Dukes.  That is, Ms. Dukes was terminated for violations of the FDCPA and Company policies during her May 9, 2001, telephone conversation with Ms. Rangel.  Ms. Dukes, in support of her position that ADS's proffered reason was pretext for discrimination, argues that she did not violate the FDCPA, or in the alternative, if she did violate the FDCPA, she was not properly made aware that the words she used amounted to violations.[3]

---

[3]ADS disagrees with Ms. Dukes' claim that she did not violate the FDCPA or company policies during her May 9, 2001 telephone conversation with Ms. Rangel.  In support of its position, ADS points out that though Ms. Dukes', in her Memorandum in Opposition, alleges that the transcript of the telephone call was inaccurate, in her deposition testimony, Ms. Dukes alleged that the only inaccuracies were spelling errors and other minor points.  Ms. Dukes, in her deposition, specifically admitted that she made the following statements which ADS maintains are clear violations of the FDCPA:

- "I needed to see if he served the summons there at work."
- "They [Lane Bryant and World Financial Bank], have recommended legal action against you."
- Rangel needed to pay on that day "to keep it [the account] from going to legal action."
- "If you decide not to do that [pay immediately] then we're going to recommend you be served a summons there at work and let you know when to appear in court."
- "And then we'll ask for a judgment against you."
- The Plaintiff will "fax the paperwork to Rolando [Ms. Rangel's supervisor] and get the information together for the judgment and then they will go ahead and recommend that you be served with a summons there at work."
- "So the next thing you could get would be a summons from our attorney's office served there at work.

(Dukes Depo. at 317-326, Exhibit 26).

Ms. Dukes' arguments, however, do not suffice to show that ADS was motivated by discrimination when it terminated her. The Sixth Circuit has adopted an "honest belief" rule with regard to an employer's proffered reason for discharging an employee. *Smith*, 155 F.3d at 806-807. Under this rule, as long as an employer has an honest belief in its proffered nondiscriminatory reason for discharging an employee, the employee cannot establish that the reason was pretextual simply because it is ultimately shown to be incorrect. *Id.* at 806. An employer has an honest belief in its reason for discharging an employee where the employer reasonably relied "on the particularized facts that were before it at the time the decision was made." *Id.* at 807. Here, ADS terminated Ms. Dukes based upon its conclusion that Ms. Dukes had violated the FDCPA and company policies during the May 9, 2001, call to Ms. Rangel. Further supporting ADS's "honest belief" that Ms. Dukes violated the law, ADS paid monies to Ms. Rangel in settlement of threatened litigation arising from the statements Ms. Dukes made to Ms. Rangel during the May 9, 2001 call.

Viewing the evidence in the light most favorable to Plaintiff, the Court finds that Plaintiff has failed to adduce evidence from which a rational trier of fact could reasonably infer that ADS's proffered reasons had either no basis in fact or were not the actual reason for the alleged adverse action. Thus, Ms. Dukes is unable to establish pretext as a matter of law. For this additional reason, Defendant ADS is entitled to summary judgment in its favor on

Plaintiff's age and race discrimination claims.

**B.      Sexual Harassment / Hostile Environment**

Ms. Dukes alleges that she was subject to a sexually hostile work environment while working at ADS in violation of Title VII and O.R.C. § 4112.  **Defendant ADS argues that Ms. Dukes cannot demonstrate an actionable hostile work environment because (1) Ms. Dukes has failed to show that the alleged conduct of co-worker John Taylor was severe or pervasive; and (2) Ms. Dukes has failed to show that there is any basis for employer liability.**  The Court agrees with ADS.

To establish a claim under Title VII for sexual harassment based on the conduct of a coworker, the plaintiff must demonstrate that (1) she is a member of a protected class, (2) she was subjected to unwelcome sexual harassment, (3) the harassment was based on her sex, (4) the harassment unreasonably interfered with plaintiff's work performance and created a hostile or offensive work environment that was severe and pervasive, and (5) the employer knew or should have known of the charged harassment and unreasonably failed to take prompt and appropriate corrective action.  *Fenton v. HiSAN, Inc.*, 174 F.3d 827, 829-30 (6th Cir. 1999); *Blankenship v. Parke Care Ctrs., Inc.*, 123 F.3d 868, 872 (6th Cir.1997).  A hostile work environment occurs "[w]hen the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993) (internal quotations and citations omitted).  Both an objective and a subjective test must be applied: the conduct must have been severe or pervasive

19

enough to create an environment that a reasonable person would find hostile or abusive, and the victim

must subjectively regard that environment as having been abusive. *Id.* at 21-22.  Isolated incidents,

unless extremely serious, will not amount to discriminatory changes in the terms or conditions of

employment. *Morris v. Oldham County Fiscal Court*, 201 F.3d 784, 790 (6th Cir. 2000).

Appropriate factors for the court to consider when determining whether conduct is severe or pervasive

enough to constitute a hostile work environment include:

1.  the frequency of the discriminatory conduct;

2.  the severity of the discriminatory conduct;

3.  whether the discriminatory conduct is physically threatening or humiliating, or a mere
    offensive utterance;

4.  whether the discriminatory conduct interferes with an employee's work performance;
    and

5.  whether the plaintiff actually found the environment abusive.

*Id.* at 21-22; *see also Bowman v. Shawnee State Univ.*, 220 F.3d 456, 463 (6th Cir. 2000) (reciting

factors from *Harris*).  The Court has explained:

> Title VII does not prohibit "genuine but innocuous differences in the ways men and
> women routinely interact with members of the same sex and of the opposite sex."
> *Oncale*, 523 U.S., at 81.  A recurring point in these opinions is that "simple teasing,"
> *id.*, at 82, offhand comments, and isolated incidents (unless extremely serious) will not
> amount to discriminatory changes in the "terms and conditions of employment."  These
> standards for judging hostility are sufficiently demanding to ensure that Title VII does
> not become a "general civility code." *Id.*, at 80.  Properly applied, they will filter out
> complaints attacking "the ordinary tribulations of the workplace, such as the sporadic
> use of abusive language, gender-related jokes, and occasional teasing." B. Lindemann
> & D. Kadue, *Sexual Harassment in Employment Law* 175 (1992) (hereinafter
> Lindemann & Kadue) (footnotes omitted). We have made it clear that conduct must be
> extreme to amount to a change in the terms and conditions of employment, and the

Courts of Appeals have heeded this view. *See, e.g., Carrero v. New York City Housing Auth.*, 890 F.2d 569, 577-578 (C.A.2 1989); *Moylan v. Maries County*, 792 F.2d 746, 749-750 (C.A.8 1986); *See also* 1 Lindemann & Grossman 805-807, n. 290 (collecting cases granting summary judgment for employers because the alleged harassment was not actionably severe or pervasive).

*Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998).

In the instant case, the Court has reviewed the evidence Plaintiff has submitted, and concludes that even when the evidence is viewed in the light most favorable to her, Ms. Dukes has fallen far short of demonstrating that she was subjected to a hostile work environment. Mr. Taylor's alleged actions towards Ms. Dukes do not meet the "severe and pervasive" requirement for unlawful harassment. Plaintiff cites to only one allegedly derogatory comment about women, use of the Lord's name in vain (which is not sexual in nature), and staring at women's breasts.  Further, Ms. Dukes' testimony reveals that she did not perceive the environment to be abusive; when asked about Mr. Taylor's alleged comments, Ms. Dukes replied, ". . . I just let them go over my head because that was John [Taylor]."

Moreover, Defendant ADS has an affirmative defense against Plaintiff's sexual harassment claim for a hostile environment.  Ms. Dukes alleges that the hostile environment was created by the conduct of her co-worker, Mr. Taylor.  The standard for examining an employer's

conduct in connection with co-worker harassment is that of reasonableness.  *Fenton*, 174 F.3d at 829.
Thus, when an employer responds to charges of coworker sexual harassment, the employer can be
liable only if its response manifests indifference or unreasonableness in light of the facts the employer
knew or should have known." *Blankenship v. Parke Care Centers, Inc.*, 123 F.3d 868, 872-73 (6th
Cir.1997), *cert. denied*, 522 U.S. 1110 (1998).  **Defendant ADS had a policy to
prevent and correct sexual harassment.**  The policy required all ADS associates to
"immediately report to any management officials any incident of harassing conduct in violation of [the]
policy."

Ms. Dukes testified that she did not make any written complaints regarding Mr. Taylor because
she was afraid to, but that she did verbally complain to Ms. Mackanos.  Ms. Mackanos told Ms.
Dukes "they were looking into it." (Dukes Depo. at 91-94).   Ms. Dukes alleges that her fear of
repercussions prevented her from using ADS's "open door" policy to report the continued harassment
by Mr. Taylor to managers. (Pl's Memo. in Opp. at 72).  The Court finds that Ms. Dukes' perception
that she was "prevented" from taking advantage of ADS' policy is belied by the fact that she actually
reported the behavior once with no repercussions.  Further, "it is unreasonable for employees to pass
their own judgments – absent any supporting facts – about how effectively an employer's sexual
harassment policies operate." *Idusuyi v. State of Tenn. Dept. of Children's Services*, 30 Fed. Appx.
398, 404 (6th Cir. 2002).  Accordingly, this Court finds that Ms. Duke's admitted failure to take
advantage of ADS's harassment policy was unreasonable.  **For this additional reason,
Defendant ADS is entitled to summary judgment in its favor on Ms.
Dukes' hostile work environment claim.**

22

**C.       State and Federal Wiretapping Claims**

Ms. Dukes has alleged that ADS management monitored her private telephone conversations with her husband without her consent or knowledge in violation of Federal and Ohio wiretapping laws. Defendant ADS argues that Plaintiff cannot establish wiretapping claims because she is unable to refute ADS's evidence that its actions with regard to her two personal telephone calls fall squarely within exceptions to both Federal and State wiretapping laws.  This Court disagrees with ADS.

The Federal Electronic Communications Privacy Act, otherwise commonly known as Title III of the Omnibus Crime Control Act under 18 U.S.C. §§ 2510-2522 ("Title III")[4] and Ohio Wiretap statute, O.R.C. § 2933.52(A), regulate wiretapping and other interception of wire or oral communications and contains provisions for authorization of such interceptions in proper cases.  The federal and Ohio wiretapping statutes prohibit the intentional interception of any wire, oral, or electronic communication.

Defendant ADS does not deny that it intentionally intercepted Ms. Dukes private conversations. ADS instead argues that Title III's "consent exception" is applicable.  Title III's "consent exception" provides in pertinent part: "It shall not be unlawful under this chapter for a person not acting under color of law to intercept a wire, oral or electronic communication where  . . . one of the parties to the

---

[4]Congress revised Title III of the Omnibus Crime Control and Safe Streets Act, which is now known as the Electronic Communications Privacy, 18 U.S.C. §§ 2510-2521.  Title I amended Title III and now governs the use of wiretapping.  For the purposes of this case, the Court will refer to the Act as "Title III" for the sake of convenience.

communication has given prior consent to such interception . . . ." 18 U.S.C. § 2511(2)(d)[5]. Thus, under the "consent exception," ADS's interception of Ms. Dukes' private conversations with her husband are not actionable if she or her husband gave prior consent to the interception.

ADS first argues that Ms. Dukes' expressly consented to the interceptions of her private calls with her husband as "evidenced by the numerous acknowledgments that she signed . . . ." (Def's Mot. for Summ. J. at 25).  The Court has reviewed the "acknowledgments" cited by Defendant ADS and disagrees with ADS's conclusion.

The "acknowledgments" dated 2000 and 2002 are identical and provide in part: **"TO ENHANCE AND PROVIDE ADEQUATE FEEDBACK** ALLIANCE DATA SYSTEM (ADS) WILL **PERIODICALLY** TAPE RECORD AND MONITOR CONVERSATIONS **BETWEEN ASSOCIATES AND CUSTOMERS.**" (Dukes' Depo. at Exhibit 11) (emphasis added).  There is a line at the bottom where Ms. Dukes has signed each of the "acknowledgments."  This acknowledgment form is consistent with ADS' telephone monitoring policy as set forth in the March, 2001, Associate Handbook, Section 515.  The monitoring policy provides, "[w]e **periodically** monitor and tape **phone calls with our customers** to improve our associates' telephone skills and job performance." (emphasis added).

The at-issue calls, however, were not calls with customers, and notably, the ADS managers *knew* that Ms. Dukes was on the line with her husband, but nonetheless decided to intercept the calls.

---

[5]The Ohio wiretapping also has a consent exception under O.R.C. § 2933.52(B)(4) that provides an exception "if one of the parties to the communication has given the person prior consent to the interceptions . . . ."

24

In Ms. Mackanos own words: "I heard the *incoming* call in the background since I was talking to Jody at the time. *I was not going to listen since I knew the call was from her husband*, however, when she started off with the chair story, I began to listen." (Dukes Depo. at Exhibit 9) (emphasis added). ADS utilized the contents of this intercepted conversation to discipline Ms. Dukes for her "work habits" on the January 18, 2002, Unacceptable Performance Notice.[6] This UPN resulted in a suspension of Ms. Dukes' incentive pay for 90 days, a postponement of her merit pay increase and a reduction of her merit pay increase by 1%. On another occasion, Ms. Spriggs walked by Ms. Dukes' desk, saw she was on a personal call, but nonetheless intercepted the call and even broke into the conversation.[7]

There is no support for Defendant ADS's contention that Ms. Dukes' signing of these "acknowledgments" extended her express consent to the at-issue interceptions of her private calls with her husband. *See Watkins v. L.M. Berry & Company*, 704 F.2d 577, 582 (11th Cir. 1983) ("We can think of no reason why consent under title III cannot be limited. We therefore hold that consent within the meaning of section 2511(2)(d) is not necessarily an all or nothing proposition; it can be limited."). Thus, when Ms. Dukes signed the "acknowledgment," her consent was limited to the *periodic*

---

[6](*See* Dukes Depo. at Exhibit 13). The UPN States alleges that Ms. Mackanos, on March 2, 2001 (the date Ms. Mackanos intercepted Ms. Dukes' call with her husband), Ms. Dukes made "multiple derogatory comments . . . about management, ADS & other associates." This UPN was also given for FDCPA violations Ms. Dukes allegedly committed during the May 9, 2001 call to Ms. Rangel.

[7]On January 1, 2002, Mr. Fortier wrote up a report regarding a discussion management had with Ms. Dukes in which management told Ms. Dukes "not to say anything negative about co-workers, company or management . . . ." (Dukes Depo. at Exhibit 12). Consequently, Ms. Dukes did not report this incident to higher management because she did not want to risk being fired.

recording and monitoring of her calls *with customers*.

Defendant ADS next argues that, even if Ms. Dukes did not give her express consent to the interceptions of her private calls wither her husband, that she gave her implied consent. (Def's Mot. for Summ. J. at 31).  As Defendant ADS's points out, courts have construed the "consent exception" broadly to include consent that is either express or implied. *See e.g.*, *Griggs-Ryan v. Smith*, 904 F.2d 112, 116 (1st Cir. 1990); *United States v. Amen*, 831 F.2d 373, 378 (2d Cir. 1987), *cert. denied*, 485 U.S. 1021 (1988).  However, "[i]n light of the prophylactic purposes of Title III, implied consent should not be casually inferred." *Williams v. Poulos*, 11 F.3d 271, 281 (1st Cir. 1993).  Implied consent is not constructive consent. *Griggs-Ryan*, 904 F.2d at 116.  "Rather, implied consent is 'consent in fact' which is inferred 'from surrounding circumstances indicating that the party *knowingly agreed* to the surveillance.'" *Id*. at 116-17 (*quoting Amen*, 831 F.2d at 378) (emphasis added).

Defendant ADS relies on *George v. Carusone*, 849 F.Supp. 159, 164 (D.Conn. 1994), to support its contention that a finding of implicit consent is appropriate in the case at bar.  This Court finds the facts of the *George* case to be readily distinguishable.  In *George*, the at-issue interceptions occurred at a police station where the station had a system installed that recorded *all* of the incoming and outgoing calls on all but three of the phones in the station.  *Id*. at 161.  Two of the officers that worked at the station brought an action alleging violations of the wiretapping statutes when their private telephone conversations were intercepted by this system. *Id*. at 164.  An arrestee also brought suit for calls he placed from the station that were intercepted. *Id*.  The *George* court pointed out that the employee-officers knew about the station's recording system, that the station had "affixed labels to many of the station's phones to alert users that their conversations would be recorded" and "circulated

26

memoranda to all employees informing them that the . . . system would record incoming and outgoing calls," and that station "employees regularly talked about the pervasive recording of their phone calls." *Id*. Additionally, the *George* court noted that the officer-employees "knew their conversations would be recorded" and "[d]espite knowledge of [the station's] routine recording of phone calls, [the officer-employees] used the phones regularly." *Id*. Based upon the foregoing circumstances, the *George* court concluded that the officer-employees' "knowledge of the system and subsequent use of the phones is tantamount to implied consent to the interception of their conversations." *Id*. By contrast, the *George* court found that the interception of the arrestee telephone call was not implicitly consented to because he did not know of the station's wiretap. *Id*.

As set forth above, there is no evidence indicating that Ms. Dukes knew that the at-issue phone lines were monitored "at all times" (as opposed to just "periodically" and "between associates and customers" as all the evidence seems to suggest). Thus, Ms. Dukes' consent to the interception of her private phone conversations with her husband on those lines cannot be implied as it was in *George*.

This Court finds the Eleventh Circuit's decision in *Watkins*, *supra*, to be instructive.  In *Watkins*, a sales employee claimed the interception of her private call by a supervisor violated Title III. 704 F.2d at 579.  Like ADS, the *Watkins*' employer had an established policy, of which all employees were informed, of monitoring solicitation calls as a part of its regular training program to improve sales techniques.  *Id*.  The monitoring was accomplished with a standard extension telephone, located in the supervisor's office, which shared lines with the telephones in the employees' offices. *Id*.  Personal calls from the employees' phone lines were permitted. *Id*.  As ADS does now, the *Watkins* defendants argued that the sales employee had implicitly consented to the monitoring because she used phone lines

on which she knew the monitoring was possible. *Id*. at 580.  The *Watkins* court, recognizing Title III's

"strong purpose to protect individual privacy by strictly limiting the occasions on which interception may

lawfully take place," found that there was no implied consent to monitoring of her personal calls.  *Id*. at

581.

In the present case, Defendant ADS, in support of its argument that Ms. Dukes' implicitly

consented to the at-issue interceptions, explains: "ADS management overheard in March and

September of 2001 on a phone line that the ***Plaintiff knew was monitored at all*** times." (Def's Mot.

for Summ. J. at 24) (emphasis added).  Though this Court would find that Ms. Dukes had implicitly

consented to the at-issue interceptions if the phone lines were monitored at all times and if Ms. Dukes

knew of this when she utilized the lines for private conversations, there is not a shred of evidence that

Ms. Dukes *knew* the phone line she was using was monitored "at all times."  In fact, there is no

evidence even suggesting that the lines were, in fact, monitored "at all times."  Instead, all of the

evidence seems to indicate that the monitoring was "periodic," limited to conversations between

associates and customers and done for training purposes. *See* ADS monitoring policy, March, 2001,

Associate Handbook, Section 515; and Taping & Monitoring acknowledgment forms.


Accordingly, the Court finds that Defendant ADS is not protected by the consent exception.

The Court has reviewed the other exceptions to federal and state wiretapping statutes and finds none of

them to be applicable here.  Accordingly, with respect to Ms. Dukes' state and federal wiretapping

claims, Defendant ADS's Motion for Summary Judgment is denied.

**D.**     **Ohio Common Law Claims**

28

### 1.     Breach of Privacy

Ms. Dukes has alleged a common law cause of action for invasions of privacy, arising out of the two telephone calls discussed *supra*. (Am. Compl. ¶ 33).  Defendant ADS argues that Ms. Dukes' breach of privacy claim fails because she cannot rebut ADS's evidence that it did not intentionally interfere with her private affairs, and even if it did, ADS's actions with regard to the two telephone calls cannot possibly be found to be highly offensive to the reasonable person.  This Court disagrees.

The right to privacy encompasses, ". . . the right to be let alone, to be free from unwarranted publicity, and to live without unwarranted interference by the public in matters with which the public is not necessarily concerned." *Clark v. Clark*, 2005 WL 2414789, *2 (Ohio App. 6 Dist.,2005) (*quoting Housh v. Peth*, 165 Ohio St. 35 (1956) at paragraph one of the syllabus).  Actionable intrusion into one's privacy rights includes harm caused by unreasonable intrusion into another's seclusion. *Id*. (*citing* 3 Restatement of the Law 2d, Torts (1977), 376, Section 652A(2)(a)-(d)); *Housh*, 165 Ohio St. at paragraph two of the syllabus).  The Ohio Supreme Court, in *Sustin v. Fee*, 69 Ohio St.2d 143, 145 (1982), stated that the scope of this type of actionable invasion of privacy is set forth in the Restatement of Law 2d, Torts (1965) 378, Section 652B.  Section 652B provides:

> One who intentionally intrudes, physically or otherwise, upon the solitude or seclusion of another or his private affairs or concerns, is subject to the liability to the other for invasion of his privacy, if the intrusion would be highly offensive to a reasonable person.

Wiretapping is an example of an actionable intrusion. *See Scroggins v. Bill Furst Florist and Greenhouse, Inc*., 2004 WL 41716, *7 (Ohio App. 2 Dist.,2004) (recognizing that wiretapping is an intrusive action); *State v. Davies*, 145 Ohio App.3d 630, 637 ("Whenever there is a violation of the

29

wiretap law, a person who unknowingly had his conversation intercepted suffers from an invasion of privacy.[8]").

In the present case, as set forth in Section III.C., *supra*, Defendant ADS management intercepted Ms. Dukes' private calls with her husband even though they knew they were private calls. On one of the calls, the manager listened for approximately thirty minutes to the conversation. That manager then typed up an incident report which divulged the contents of that call and again used the contents of the call to punish Ms. Dukes' through issuing a UPN. On another occasion, the manager intercepted Ms. Dukes' private call and listened in for approximately fifteen minutes and even broke into the conversation. Based upon these circumstances, the Court must reject Defendant ADS's contention that, as a matter of law, a reasonable person would not consider these interceptions "highly offensive."

Accordingly, with respect to Ms. Dukes' common law cause of action for invasions of privacy, Defendant ADS's Motion for Summary Judgment is denied.

## 2. Breach of Express Contract, Breach of Implied Contract & Promissory Estoppel

Since the allegations surrounding Ms. Dukes' claims of breach of express contract, breach of implied contract and promissory estoppel are the same, the Court will address the claims together. Ms. Dukes does not allege that she had an employment contract with ADS, but instead claims that the language of the January 18, 2002 UPN amounts to an express and/or implied contract between Plaintiff

---

[8]The Ohio appellate court also noted that "[t]he invasion of privacy is not a one time occurrence. Every time the contents of the illegally intercepted conversation are disclosed, the person will suffer a further invasion of privacy." *Id*. (*quoting State v. Thomas*, 1989 WL 74879 (Ohio App. 4 Dist.), appeal not allowed 46 Ohio St.3d 707 (1989), *cert. denied* 493 U.S. 1077 (1990).

and ADS because it implies that if there is no recurrence of bad behavior on her part, she could not be fired from ADS.  Ms. Dukes admits that the UPN does not provide a promise of employment for a certain date.  Ms. Dukes' argues that this UPN-created contract was breached when she was terminated.  Defendant ADS argues that Ms. Dukes' breach of contract and promissory estoppel claims fail as a matter of law because Plaintiff has proffered no evidence that a contract exists between the parties, or that ADS promised her continued employment.  The Court agrees with Defendant ADS.

**The elements of a breach of contract claim are as follows: (1) the terms of the contract, (2) performance by the plaintiff of his obligations, (3) the breach by  the defendant, (4) damages, and (5) consideration.** *American Sales, Inc. v. Boffo*, **593 N.E.2d 316, 321 (Ohio App. 1991).**   In Ohio, contracts for employment are presumptively terminable at-will. *Mers v. Dispatch Printing Co.*, 19 Ohio St.3d 100 (1985)(syllabus ¶¶ 1 and 2).

Ms. Dukes' breach of contract claims fail because they lack the first element; that is, she has not established that the terms of the contract are what she claims them to be.  The language in the UPN upon which Ms. Dukes relies to claim the existence of an express or implied contract for continued employment states: "a recurrence of the above, or continued unacceptable performance, attendance, tardiness, attitude, etc. could result in termination." (Pl's Memo. in Opp. at 80).  The Court finds that this language does not support a finding of an express or an implied contract for continued employment.[9]

---

[9]Further supporting this conclusion is Ms. Dukes' own admission that she was aware that she was an "at-will" employee, that her employment was "at management's discretion," and that she was

This Court also must reject Ms. Dukes' arguments that she has an actionable promissory estoppel claim. Though Ohio courts recognize promissory estoppel as one of the exceptions to the at-will doctrine, the exception is not applicable here. *Mers*, 19 Ohio St.3d 100 at syllabus ¶ 3). The essential elements of a claim of promissory estoppel are:

    (1)  a clear and unambiguous promise;

    (2)  reliance by the party to whom the promise is made;

    (3)  such reliance must be reasonable and foreseeable; and

    (4)  the party relying on the promise must have been injured by such reliance.

*Healy v. Republic Powdered Metals, Inc.*, 85 Ohio App. 3d 281, 284 (1992). To support a claim, the promise must have been specifically one of job security. *Wing v. Anchor Media, Ltd. of Texas*, 59 Ohio St. 3d 108 (1991)(syllabus ¶ 2).

In the present case, the Court finds that the UPN's language does not amount to the required "clear and unambiguous promise" of job security or continued employment. **For the foregoing reasons, Defendant ADS is entitled to summary judgment in its favor on Ms. Dukes' common law breach of express contract, breach of implied contract and promissory estoppel claims.**

### 3.    Public Policy

Ms. Dukes alleges that her termination was in violation of public policy because it was

---

never told she could only be terminated for "just cause." (Dukes' Depo. at 254-255, 263-266, 273-275; Pl. Ex. 15, 16, 17).

motivated by age and gender. (Pl's Memo. in Opp. at 84-85).  This Court disagrees.

Public policy warrants an exception to the at-will doctrine when the following elements are satisfied: (1) a clear public policy exists and is manifested in a state or federal constitution, statute, or administrative regulation, or in the common law; (2) terminating employees under the circumstances involved in the plaintiff's case would jeopardize the public policy; (3) the plaintiff's termination was motivated by reasons related to the public policy; and (4) the defendant lacked a legitimate business justification for terminating plaintiff. *Painter v. Graley*, 70 Ohio St. 3d 377, 384, (1994); *see also,* Collins v. Rizkana, 73 Ohio St.3d 65, 69 (1995).

As Defendant ADS points out, Ms. Dukes cannot establish the second, *i.e.*, "the jeopardy element," because neither the state nor federal law at issue here can form the basis of a public policy claim. Where, as here, the source of the public policy is a statute that provides the substantive rights and remedies, "the issue of adequacy of remedies" becomes a particularly important component of the jeopardy analysis. *Id.*, (*citing Collins*, 73 Ohio St.3d at 73). "Simply put, there is no need to recognize a common-law action for wrongful discharge if there already exists a statutory remedy that adequately protects society's interests." *Wiles v. Medina Auto Parts*, 96 Ohio St.3d 240, 244.

In *Wiles*, the Ohio Supreme Court held that the Family & Medical Leave Act, 29 U.S.C. §2601, *et seq.* ("FMLA") cannot form the basis for a public policy claim because the FMLA itself contains a sufficient remedial scheme. *Id.* at 245-46. As with the FMLA, Title VII and O.R.C. Chapter 4112 also provide for a broad spectrum of remedies, including lost wages and benefits, other actual monetary losses sustained, attorney's fees, and punitive damages. *See Berge v. Columbus Community Cable Access*, 136 Ohio App.3d 281, 307 (1999) (concluding that the trial court did not

err in dismissing plaintiff's public policy claim because the remedies under R.C. 4112 were sufficient to provide the complete relief).

Even if Ms. Dukes could pursue a public policy claim based upon any of the state or federal laws identified in her Amended Complaint, the Court finds that her public policy claim necessarily fails for the same reasons that her underlying claims fail. *See* Section III. A and B, *supra*.

**Accordingly, Defendant ADS is entitled to summary judgment in its favor on Ms. Dukes' public policy claims.**

## V.  CONCLUSION

For all of the foregoing reasons, the Court **GRANTS** in part and **DENIES** in part Defendant ADS's Motion for Summary Judgment (Doc. 51).

Plaintiff's state and federal wiretapping claims remain pending as does her common law breach privacy claim.  The remaining claims are dismissed with prejudice

The Clerk shall remove Document 51 from the Court's pending motions list.

**IT IS SO ORDERED.**

  /s/ George C. Smith
**GEORGE C. SMITH, JUDGE**
**UNITED STATES DISTRICT COURT**